UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

OSCAR MORA,

            Plaintiff,

     v.

W. HUGHES, Deputy Supt. of Security,
J. RAO, Medical Doctor, and A. HAYNES,
Registered Nurse,

            Defendants.

_____

**DECISION AND ORDER**

6:15-CV-06038 EAW

## **INTRODUCTION**

Plaintiff Oscar Mora ("Plaintiff"), proceeding *pro se*, is a prisoner currently incarcerated at the Attica Correctional Facility ("Attica"). He brings this action against three Attica employees—W. Hughes ("Hughes"), Deputy of Security; J. Rao ("Dr. Rao"), a doctor; and A. Haynes ("Haynes"), a nurse (collectively, "Defendants")—pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (Dkt. 1). Presently before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. 72). For the reasons discussed below, the Court grants Defendants' motion.

# BACKGROUND

## I.    Factual Background

The following facts are taken from Defendants' statement of undisputed facts (Dkt. 72-1), Plaintiff's response (Dkt. 77), and their supporting documents.  Where the parties specifically controvert particular facts, the Court has noted the disagreement.  As is required, the Court views all facts in the light most favorable to Plaintiff.

### A.    The Glucometer

Plaintiff suffers from Brittle Type 1 Diabetes, which is "the most severe category of Type 1 Diabetes," as well as hypoglycemia (low blood sugar) and hyperglycemia (high blood sugar).  (*Id.* at ¶ 8).  Between 2008 and 2017, Plaintiff's blood sugar was checked 6,945 times, and his blood sugar was normal on 2,014 of those tests, or 29% of the time. (*Id.* at 7).

Blood glucose meters, also referred to as glucometers, are devices used to track fluctuations in blood glucose level.  Blood Glucose Meter: How to Choose, Mayo Clinic (Dec. 17, 2016), https://www.mayoclinic.org/diseases-conditions/diabetes/in-depth/blood-glucose-meter/art-20046335.  The user inserts a test strip into the glucometer, uses a special needle called a lancet to get a drop of blood, touches the test strip to the blood, and waits for the reading to appear on the device's screen. *Id.*  The New York State Department of Corrections and Community Supervision ("DOCCS") does not permit inmates to have personal glucometers; they are instead kept by medical staff.  (Dkt. 72-1 at ¶ 1).  This is because the lancets used with the glucometers may be used for tattooing or inflicting harm and can contribute to the spread of diseases such as HIV and Hepatitis C.

(*Id.* at ¶ 3). However, an inmate may be provided with an insulin pump[1] if an endocrinologist and the facility chief medical officer recommend one. (*Id.* at ¶ 6).

Plaintiff was scheduled to have appointments with an endocrinologist in 2008, 2009, 2010, 2012, and 2017 (Dkt. 72-5 at ¶ 13), but he refused to go each time, claiming that necessary precautions were not undertaken to ensure his safety during transport in the event that he experienced a medical complication. (Dkt. 77 at ¶ 35). The endocrinologist seen by Attica inmates is approximately 20 minutes away from the facility, and in the event of an adverse reaction, Attica staff are trained to transport inmates to the nearest hospital. (Dkt. 81 at ¶¶ 15-16).[2] Plaintiff has requested a video conference with an endocrinologist instead. (Dkt. 77 at ¶ 36).

During the course of Plaintiff's incarceration at Attica, Plaintiff had his blood sugar level checked twice a day and could have insulin or sugar administered as needed, as well as emergency medical access 24 hours a day and seven days a week. (Dkt. 72-1 at ¶ 16). As a result of his condition, Plaintiff has called medical staff to his cell for treatment on many occasions, gone to the emergency room, and in one instance was found on the floor.

---

[1]    An insulin pump is a device that continuously measures blood sugar levels and automatically dispenses insulin, allowing an inmate to receive insulin without an emergency medical callout. (Dkt. 72-1 at ¶ 6; Dkt. 72-5 at ¶ 12).

[2]    Docket 81 is the declaration of physician's assistant Deborah Graf, and Plaintiff claims the statements contained in this declaration are HIPAA violations. (Dkt. 79 at 2). "Although HIPAA generally provides for the confidentiality of medical records, . . . an individual cannot sue for its enforcement or for damages caused by disclosures." *Ross v. Westchester Cty. Jail*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (citing 42 U.S.C. §§ 1320d-1 to d-7 and *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) (collecting cases)). Accordingly, the Court finds Plaintiff's arguments regarding HIPAA are without merit.

(Dkt. 77 at 7; Dkt. 77-2 at 87-122). Dr. Rao informed Plaintiff that while the processes at Attica were adequate to treat his illness, a glucometer would not be a bad idea. (Dkt. 72-5 at ¶ 6). Dr. Rao had previously spoken with head of security, Hughes, about allowing diabetic inmates to have glucometers, and Hughes told him that the devices were prohibited. (Dkt. 72-4 at ¶ 6; Dkt. 72-5 at ¶ 7). However, Dr. Rao encouraged Plaintiff to reach out to security directly and tell them that the doctor had approved a glucometer for him. (Dkt. 72-5 at ¶¶ 7-8). Hughes denied Plaintiff's request for the device. (Dkt. 72-4 at ¶ 7).

During the course of his incarceration, Plaintiff has not suffered from ketoacidosis, diabetic coma, diabetes-related strokes, blindness, amputation, or ulcers. (Dkt. 72-5 at ¶ 15). Plaintiff also consistently refused to follow a diabetic diet or instructions from Attica medical staff regarding insulin dosage. (*Id.* at 6-18). He was placed on a controlled low-carbohydrate diet on July 1, 2008, from which he was removed at his request on September 29, 2008. (Dkt. 77-2 at 157-58, 161).

**B.** **December 29, 2013**

Around 11:00 p.m. on December 29, 2013, Plaintiff informed a corrections officer that he was not feeling well. (Dkt. 72-1 at ¶ 8). The officer called Nurse Haynes and told him that Plaintiff was having a diabetic issue.[3] (*Id.* at ¶ 8; Dkt. 77-2). Pursuant to Attica

---

[3]     Nurse Haynes in his declaration states that he was informed Plaintiff was having "a diabetic issue of low blood sugar." (Dkt. 72-3 at ¶ 4). However, the logbook entry by the officer states that Plaintiff was not feeling well and notes that he is diabetic (Dkt. 77-2 at 140), and the memorandum submitted by Nurse Haynes on January 1, 2014, states the officer advised him that "there seemed to be a diabetic issue" (*id.* at 142). Viewing the record in the light most favorable to Plaintiff, the Court will assume for purposes of this

rules, Nurse Haynes was not permitted to go in the gallery during the night shift, and he was concerned that it would take too long to arrange to escort Plaintiff to the infirmary. (Dkt. 72-3 at ¶ 6; Dkt. 81 at ¶ 18). Nurse Haynes told the officer to provide Plaintiff with sugar and inform him if Plaintiff still had symptoms after 10 minutes. (Dkt. 72-1 at ¶ 9). Nurse Haynes did not hear from the officer again that evening. (Dkt. 72-3 at ¶ 10). The officer then told Plaintiff that Nurse Haynes would not treat Plaintiff unless Plaintiff was having a diabetic reaction, and Plaintiff told the officer that he was; however, the officer walked away without informing Nurse Haynes. (Dkt. 72-1 at ¶ 12). The officer logbook for that night states Plaintiff complained about not feeling well for diabetic reasons and that Nurse Haynes "said to have him eat or drink something, did not want to see him." (Dkt. 77-2 at 140).

Plaintiff slept poorly, waking up throughout the night to urinate. (Dkt. 72-6 at 11). The next morning, Plaintiff had his regular blood sugar check and was provided insulin. (Dkt. 72-1 at ¶ 13). His blood sugar level was over 400, although it had been that high on numerous other days that month as well. (Dkt. 72-3 at ¶ 13).

## II.    **Procedural Background**

Plaintiff filed the instant action on January 21, 2015. (Dkt. 1). This Court granted Plaintiff leave to proceed *in forma pauperis* on September 29, 2015. (Dkt. 6).

On May 15, 2016, Dr. Rao moved to dismiss the complaint with respect to the claims asserted against him (Dkt. 15), and the Court denied the motion on February 28, 2017 (Dkt.

---

motion that the corrections officer did not specify that Plaintiff was having a low blood sugar issue when speaking to Nurse Haynes.

27). All Defendants submitted separate Answers to the Complaint. (Dkt. 18; Dkt. 32; Dkt. 53). The case was referred to United States Magistrate Judge Jonathan W. Feldman on August 31, 2016, for all pretrial matters excluding dispositive motions. (Dkt. 20).

On June 20, 2018, Defendants filed the instant motion for summary judgment. (Dkt. 72). Plaintiff responded on September 17, 2018 (Dkt. 77), and Defendants replied on September 27, 2018 (Dkt. 78). On October 11, 2018, Plaintiff filed a sur-reply without leave of the Court (Dkt. 79), and Defendants subsequently filed a letter with an amended Declaration of Deborah Graf to correct a mistake in the original submitted with their reply papers (Dkt. 81). Plaintiff also filed a reply to this letter. (Dkt. 82). The Court has considered all of the parties' submissions related to the instant motion in rendering this Decision and Order.

## DISCUSSION

### I. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d

Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"It is well-settled that pro se litigants generally are entitled to a liberal construction of their pleadings, which should be read 'to raise the strongest arguments that they suggest.'" *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)); *see also McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) ("[W]hen [a] plaintiff proceeds *pro se* . . . a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.").

## II.    Claims of Inadequate Medical Care

"The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, guarantees freedom from cruel and unusual punishment." *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).   An Eighth Amendment claim arising out of inadequate medical care requires a plaintiff-inmate to demonstrate that a defendant was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   A claim for deliberate indifference has both an objective and a subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

Objectively, a medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).   "[I]f the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay . . . in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (quotation and original alteration omitted).   It is appropriate "to consider the absence of concrete medical injury as one of the relevant factors in determining whether the asserted deprivation of medical care was sufficiently serious to establish a claim under the Eighth Amendment." *Smith v. Carpenter*, 316 F.3d 178, 189 (2d Cir. 2003).

"Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the 'equivalent of criminal recklessness.'" *Lapierre v. County*

*of Nassau*, 459 F. App'x 28, 29 (2d Cir. 2012) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Specifically, a plaintiff must prove that the prison official knew of a serious medical condition and nonetheless disregarded the plaintiff's medical needs. *Farmer*, 511 U.S. at 837 (holding that a prison official does not act in a deliberately indifferent manner towards an inmate unless he "knows of and disregards an excessive risk to inmate health or safety"); *see also Beaman v. Unger*, 838 F. Supp. 2d 108, 110 (W.D.N.Y. 2011) ("To establish deliberate indifference, . . . [a] plaintiff must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain."). More than medical malpractice is required to establish a constitutional violation. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness[.]") Similarly, mere negligence is not actionable. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

Additionally, when applying the deliberate indifference standard, courts should accord prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Trammel v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

A. **Glucometer Claims**

Plaintiff maintains that Dr. Rao was deliberately indifferent because he advised Plaintiff to ask Hughes for a glucometer instead of speaking with Hughes himself (Dkt. 77

at ¶ 13), and that Hughes was deliberately indifferent for failing to approve the glucometer (*id.* at ¶ 24). The Court grants Defendants' motion for summary judgment as to these claims for the following reasons.

### 1.    <u>Serious Medical Need</u>

A reasonable trier of fact could not find that the denial of Plaintiff's request for a glucometer satisfies the objective prong of the deliberate indifference standard. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see Green v. Venettozzi*, No. 9:14-CV-1215 (BKS/CFH), 2018 WL 7917917, at *19 (N.D.N.Y. Nov. 21, 2018) ("To the extent that plaintiff believed that different treatment would remedy his diabetes symptoms, this belief does not amount to inadequate medical care as plaintiff's concerns constitute nothing more than a mere disagreement with [the doctors'] treatment plans, which is not actionable under the Eighth Amendment."), *adopted*, 2019 WL 624922 (N.D.N.Y. Feb. 14, 2019). A prisoner "is not entitled under the Eighth Amendment to the best treatment available; he is merely entitled to 'reasonable care.'" *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (citing *Salahuddin*, 467 F.3d at 279).

The record before the Court demonstrates that the treatment Plaintiff received for his diabetes was adequate. Throughout Plaintiff's incarceration at Attica, he had his blood sugar level checked twice a day and could request testing at any time. (Dkt. 72-1 at ¶ 16). He also could have had insulin or sugar administered as needed, and had emergency

medical access 24 hours a day, seven days a week. (*Id.*). Additionally, Plaintiff while incarcerated did not suffer any serious side effects from his diabetes, such as ketoacidosis, diabetic coma, diabetes-related strokes, blindness, amputation, or ulcers. (Dkt. 72-5 at ¶ 15).

Plaintiff argues he did not receive adequate treatment because his urine was only checked for ketones when his blood sugar levels were above 450, and he called medical staff to his cell for treatment, went to the emergency room, and in one instance was found on the floor. (Dkt. 77 at 7; Dkt. 77-2 at 87-122). However, these minor lapses in treatment, which the record shows did not result in any of the serious side effects discussed above, are not sufficient to establish a serious medical need. *See Carpenter*, 316 F.3d at 186-87 (discussing that a risk of harm "may be absent . . . although an inmate suffers from an admittedly serious medical condition . . . where the alleged lapses in treatment are minor and inconsequential"); *Farid v. Ellen*, No. 01 Civ. 8292(PKC), 2006 WL 59517, at \*10 (S.D.N.Y. Jan 11, 2006) (granting summary judgment to defendants because "[d]espite plaintiff's detailed record of various alleged lapses by defendants in treating his condition, plaintiff has come forward with no evidence of how this alleged delay exacerbated his condition or worsened his prognosis for effective treatment"), *aff'd*, 593 F.3d 233 (2d Cir. 2010).

Additionally, the record demonstrates that many of these incidents stemmed from Plaintiff's refusal to follow the recommendations of the prison's health care providers. *See Nelson v. Deming*, 140 F. Supp. 3d 248, 261 (W.D.N.Y. 2015) ("An inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not

deliberately indifferent to the inmate's medical needs."); *Scarbrough v. Thompson*, No. 10-CV-901, 2012 WL 7761439, at *12 (N.D.N.Y. Dec. 12, 2012) (holding that where inmate refused medical care from a nurse, "any alleged delay or interference in treatment was due to [the inmate's] own actions" and could not subsequently "be transformed into an Eighth Amendment claim"), *adopted*, 2013 WL 1100680 (N.D.N.Y. Mar. 15, 2013); *Ross v. Kelly*, 784 F. Supp. 35, 46-47 (W.D.N.Y. 1992) (evidence failed to establish deliberate indifference to medical needs where plaintiff was largely to blame for many of the delays in his treatment due to his second-guessing of physician's advice and refusal of treatment), *aff'd*, 970 F.2d 896 (2d Cir. 1992); *see also Jones v. Smith*, 784 F.2d 149, 152 (2d Cir. 1986) (holding the district court properly dismissed the plaintiff's deliberate indifference claim because given the inmate's "constant declinations to be treated by prison doctors, failure to treat his back was at best a question of malpractice[.]").

For example, Plaintiff refused the diabetic diet prescribed to him (Dkt. 77-2 at 161), and Plaintiff's medical records demonstrate that the incidents where he had high blood sugar often occurred after he ate a high carbohydrate meal. (*See, e.g.*, *id.* at 87 (medical record from July 22, 2008, noting Plaintiff's blood sugar levels were high and that he had eaten a high carbohydrate meal that morning); *id.* at 103 (medical record from March 26, 2012, noting Plaintiff was given a pass to the emergency room for high blood sugar, but that Plaintiff "admits to sugar intake last PM with cereal" and that he is noncompliant with his diet)). Plaintiff argues that he requested to no longer receive the diet prescribed for his diabetes because while on the meal plan, he was not allowed to take snacks from the mess hall, which he contends prevented him from eating when his blood sugar was low. (Dkt.

77 at ¶¶ 39-41).  He also argues he would have been on the therapeutic diet if he was allowed to eat in his cell, which would allow him continuous access to food.  (*Id.* at ¶ 39).  However, the record shows that Attica's staff determined it was not medically necessary for Plaintiff to be fed in his cell.  (*Id.*).  The record also shows that Plaintiff could have requested juice or glucose[4] from his cell at any time if he thought his blood sugar was low, and that he frequently did so.  (*See, e.g.*, Dkt. 77-2 at 96 (medical record from February 20, 2011, noting that Plaintiff was given a glass of lemon-lime soda and milk); *id.* at 97 (medical record from March 17, 2011, noting that Plaintiff was given milk after staff was notified of a hypoglycemic episode)).

The record also shows that Plaintiff received multiple referrals to an endocrinologist so he could be evaluated for an insulin pump, but that he refused to go to any of the appointments.  (Dkt. 72-5 at ¶ 13).  Plaintiff contends he refused because when he went to see an endocrinologist while incarcerated at Attica in 2008, his blood sugar levels were over 500 when he returned, which is a level that requires medical attention at the prison, and that he instead requested a video conference with an endocrinologist.  (Dkt. 77-2 at 94, 154).  However, the record shows the endocrinologist seen by Attica inmates is only 20 minutes away from the facility, and in the event of an adverse reaction, Attica staff are trained to transport inmates to the nearest hospital.  (Dkt. 81 at ¶¶ 15-16).  A reasonable trier of fact could only find that these measures were adequate to ensure Plaintiff's well-being while being escorted to and from the endocrinologist.

---

[4]    Plaintiff contends there have been times when glucose tubes were not available, but admits that he had access to sugar packets.  (Dkt. 77 at 15).

Plaintiff also contends that having his blood glucose levels tested twice a day was inadequate, and references a supplement from the American Diabetes Association that recommends testing three times a day.[5] (Dkt. 77 at ¶ 20). However, a recommendation is just that—a recommendation, and moreover it does not state that being tested twice a day is inadequate. The only evidence Plaintiff presents about the inadequacy of twice-a-day testing is his own testimony, which is insufficient to prove his treatment was unreasonable. *See Jeffers v. City of New York*, No. 14-CV-6173 (CBA) (ST), 2018 WL 904230, at *31 (E.D.N.Y. Feb. 13, 2018) ("If [the plaintiff] had adduced some expert testimony or argument as to why twice-daily finger sticks were insufficient treatment for diabetics in general, or for him specifically, he may have been able to raise a dispute of material fact. But, without more than his own testimony, such evidence is legally insufficient to prove a sufficiently serious deprivation of adequate care."). Additionally, Plaintiff could have requested additional testing of his blood-glucose levels at any time (Dkt. 72-7 at ¶ 2), and Dr. Rao in his declaration states "that the processes in place at Attica were adequate for treating [Plaintiff]'s illness." (Dkt. 72-5 at ¶ 6). Moreover, the record shows that Plaintiff has never filed a grievance with Attica regarding the number of times his blood sugar was tested daily. (Dkt. 72-6 at 13).

---

[5] In their motion, Defendants address Plaintiff's contentions about additional blood sugar checks as a separate claim. (Dkt. 72-7 at 11-12). However, the Court finds that Plaintiff references the additional blood sugar checks in an attempt to demonstrate the inadequacy of his current medical treatment without the glucometer and therefore treats such contentions as part of his glucometer claim.

Plaintiff's reliance on *Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999), is misplaced. There, the Court found that the diabetic plaintiffs could have stated a deliberate indifference claim where they alleged that they did not receive diabetes-appropriate meals and only had their blood-sugar levels tested "a minimal number of times each year." *Id.* at 197-98. By contrast, Plaintiff had the option of receiving a meal prescribed for diabetics that he opted out of, and his blood-sugar levels were tested at least twice a day every day. Plaintiff also references *Hadix v. Caruso*, 465 F. Supp. 2d 776 (W.D. Mich. 2006), where the Court found the medical staff violated a plaintiff's Eighth Amendment rights because, in addition to his request for a glucometer being denied, he was over-prescribed insulin, received no in-patient care to monitor his blood sugar, and had no endocrinologist consultation ordered, resulting in his death due to hypoglycemia. *Id.* at 781. Here in contrast, the record shows Plaintiff received care at least twice a day, had access to around-the-clock emergency services, had not been over-prescribed insulin, and had multiple endocrinologist appointments scheduled but refused to go.

Plaintiff also argues that not having access to a glucometer is a violation of DOCCS' policy. (Dkt. 77 at ¶ 24). He refers to an excerpt from the Diabetes Mellitus Primary Care Practice Guideline issued by DOCCS on June 18, 2014 (the "Guideline"), that states: "Regular self-monitoring blood glucose (SMBG) is especially important for patients treated with oral agents or insulin to monitor for and prevent hypoglycemia." (Dkt. 77-2 at 136). However, the record shows that the Guideline does not institute a policy of giving diabetic prisoners glucometers; instead, it instructs the prison medical staff about how often they should test a patient's blood-sugar levels. It is undisputed that no prisoner in DOCCS

custody is permitted, or was permitted after the Guideline was issued, to possess a personal glucometer. (Dkt. 72-1 at ¶ 3). Additionally, the Guideline is directed at the prison clinical care team (Dkt. 77-2 at 135), and the blood glucose testing section is in a portion of the Guideline that discusses other tests that clinicians should perform on diabetic patients. Moreover, the section about blood-glucose monitoring instructs the medical team that "[t]he frequency of SMBG . . . should be sufficient to facilitate reaching glucose goals." (*Id.* at 136). Such instructions to the clinical staff would not be necessary if the prisoners were monitoring their blood glucose levels themselves.[6]

Plaintiff also argues that he could be prescribed a device such as the FreeStyle Libre, which is a glucose monitoring device that does not require the use of a needle, and that Dr. Rao should have advocated for such a device for him. (Dkt. 77 at ¶ 19; Dkt. 77-1 at 10). However, Plaintiff "is not entitled under the Eighth Amendment to the best treatment available; he is merely entitled to 'reasonable care.'" *Barnes*, 926 F. Supp. 2d at 506 (citing *Salahuddin*, 467 F.3d at 279); *see Hill*, 657 F.3d at 123 ("[T]he essential test is one of medical necessity and not one simply of desirability." (quotation omitted)). As detailed above, Plaintiff's treatment has been adequate, and his disagreement with said treatment and desire to be prescribed a particular device is not sufficient to establish a constitutional violation.

---

[6]     Even if the Guideline did suggest that a diabetic prisoner should monitor his or her own blood glucose levels, the Guideline was issued by the regional medical director, and there is no indication of whether DOCCS security administrators reviewed the medical guideline. As discussed later, Hughes' decision was made for security reasons pursuant to security policy, and a trier of fact could only find the decision was a reasonable application of that policy.

## 2. Deliberate Indifference

The Court finds the record cannot show that Plaintiff suffered a serious medical need from being denied access to a glucometer, but even if a reasonable juror could find there was an objective harm, the record before the Court cannot demonstrate that Hughes or Dr. Rao acted with deliberate indifference.

The record shows that Hughes' decision to deny Plaintiff a glucometer was based on the DOCCS security policy.[7] (Dkt. 72-4 at ¶¶ 2-7). The policy was in place because the lancets used with the glucometers may be used for tattooing or inflicting harm and can contribute to the spread of diseases such as HIV and Hepatitis C. (Dkt. 72-1 at ¶ 3). In light of the "wide-ranging deference" afforded to prison administrators for "the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Bell*, 441 U.S. at 547, a reasonable trier of fact could only find that Hughes did not act with deliberate indifference

---

[7]    Plaintiff contends, without citing any other supporting evidence, that such a security policy does not exist. Such self-serving statements are not sufficient to defeat a motion for summary judgment. *See Davidson v. Desai*, 817 F. Supp. 2d 166, 195 (W.D.N.Y. 2011) ("Plaintiff is required to point to some evidence in the record, other than self-serving, conclusory statements establishing his claim."); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (holding a self-serving affidavit which reiterates the complaint's conclusory allegations is insufficient to preclude summary judgment). A reasonable trier of fact looking at the record before the Court could only find that such a policy existed during the events in question. Hughes, the Deputy Superintendent for Security at Attica during the events in question, denied Plaintiff's request for a glucometer because "DOCCS had various security policies pertaining to diabetic inmates," and "inmates were not permitted a glucometer." (Dkt. 72-4 at ¶¶ 2-3). Additionally, on June 4, 2014, in response to Plaintiff's grievance about the glucometer, the DOCCS Central Office Review Committee informed Plaintiff that "glucometers are not permitted for in-cell use." (Dkt. 77-2 at 147). Moreover, it is undisputed that no inmate under the care of DOCCS had a personal glucometer during that time. (Dkt. 72-1 at ¶ 3).

when he applied the DOCCS policy regarding glucometers to Plaintiff. *See Rodriguez v. Ames*, 287 F. Supp. 2d 213, 221 (W.D.N.Y. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 827 (1974)) ("Where a prison policy is related to maintaining prison security, deference to the 'expert judgment' of the corrections officials who promulgated that policy is appropriate because those officials are in the best position to judge what steps are necessary to maintain security.").

Plaintiff argues that the DOCCS policy is unconstitutional because federal prisons and other states allow prisoners to have glucometers. (*See* Dkt. 77 at ¶¶ 15-16). Just because other prison systems have policies that allow prisoners to have personal glucometers does not mean that a policy disallowing personal glucometers is unconstitutional. *See Harmelin v. Michigan*, 501 U.S. 957, 990 (1991) ("Diversity . . . in policy . . . is the very *raison d'être* of our federal system."). While the Court's research did not find cases within the Second Circuit that address the DOCCS glucometer policy, other courts that have addressed similar glucometer policies have consistently found that denying prisoners access to glucometers is not a violation of a prisoner's constitutional rights. *See Peasley v. Spearman*, No. 15-CV-01769, 2018 WL 4468823, at *18 (N.D. Cal. Sept. 18, 2018) (granting defendants' motion for summary judgment where plaintiff, a brittle Type 1 diabetic, failed to demonstrate the medical necessity of an on-person glucometer where doctors stated the device was "highly beneficial," but "not medically necessary"); *Harris v. Ghosh*, No. 10 C 7136, 2012 WL 3903894, at *7 (N.D. Ill. Sept. 7, 2012) ("The court sympathizes with Plaintiff's frustration stemming from the inconsistent delivery of insulin and his unreliable access to a glucometer, but these relatively minor

deficiencies have not exposed Plaintiff to 'excessive risk.' '[T]he Constitution is not a medical code that mandates specific medical treatment.'" (alteration in original) (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quotation omitted))).

A reasonable trier of fact could also only find that Dr. Rao was not deliberately indifferent. Plaintiff argues that Dr. Rao was deliberately indifferent because "[r]ather than speaking with Hughes personally about Plaintiff being issued a glucometer . . . Rao advised Plaintiff to write a letter to Hughes." (Dkt. 77 at ¶ 13). At least one court in this Circuit has recognized that failure to advocate for a prisoner may give rise to a deliberate indifference claim in some circumstances. *See Rodriguez v. Downstate Corr. Fac.*, No. 00 Civ. 9337(LAP), 2003 WL 1698204, at *6 (S.D.N.Y. Mar. 31, 2003) (denying summary judgment for a deliberate indifference claim where there was no indication that a parole officer "took any affirmative steps to advocate" for the release of the prisoner from the drug treatment campus after it was recommended by a doctor), *aff'd*, 94 F. App'x 864 (2d Cir. 2004). However, the record shows, and Plaintiff does not refute, that Dr. Rao approached Hughes about allowing diabetic inmates to have glucometers but was told it was against DOCCS' security policy. (Dkt. 72-4 at ¶ 6; Dkt. 72-5 at ¶ 7). Moreover, Dr. Rao states in his declaration that he does "not have the authority to overrule security about whether an inmate may be provided a glucometer" (Dkt. 72-5 at ¶ 9), and in any event "the twice-daily checks plus emergency medical callouts were sufficient to address [Plaintiff's] needs" (*id.* at ¶ 6).

Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's glucometer claims.

**B.     Claim Against Nurse Haynes**

Defendants also move for summary judgment as to Plaintiff's deliberate indifference claims against Nurse Haynes, relating to the December 29, 2013, incident. (Dkt. 72-7 at 12-13). The Court finds a reasonable trier of fact could only determine that Nurse Haynes did not act with deliberate indifference for the reasons that follow.

The record does not show that Plaintiff suffered an objective harm from this incident. Plaintiff slept poorly, waking up throughout the night to urinate. (Dkt. 72-6 at 11). He never requested emergency medical assistance. (*Id.* at 12-13). The next morning, Plaintiff had his regular blood sugar check and was provided insulin. (Dkt. 72-1 at ¶ 13). Although his blood sugar level was over 400, it was not high enough for prison medical staff to contact a doctor (Dkt. 77-2 at 94), and it had been that high on other days that month as well (Dkt. 72-3 at ¶ 13). Moreover, Plaintiff did not suffer from ketoacidosis, diabetic coma, diabetes-related strokes, blindness, amputation, or ulcers. (Dkt. 72-5 at ¶ 15). A reasonable trier of fact could not find on this record that Plaintiff suffered a serious medical need as a result of the actions (or inaction) of Nurse Haynes.

Even if the record did establish a serious medical need, a reasonable trier of fact could not find that Nurse Haynes acted with deliberate indifference. The record shows that Nurse Haynes was not permitted on the gallery, and that he told a corrections officer to provide Plaintiff with sugar and inform him if Plaintiff still had symptoms after 10 minutes, facts that Plaintiff admits. (Dkt. 72-1 at ¶ 9; Dkt. 77 at ¶ 1). Moreover, the officer logbook for that night states Plaintiff complained about not feeling well for diabetic reasons and that Nurse Haynes "said to have him eat or drink something." (Dkt. 77-2 at 140).

- 20 -

At most, the record supports a claim of negligence, not "an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Chance*, 142 F.3d at 703 (quotation omitted); *see Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in . . . treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). While Nurse Haynes potentially gave Plaintiff the wrong course of treatment,[8] nothing in the record shows any such error was malicious. *See Harris v. Westchester Cty. Med. Ctr.*, No. 08 Civ. 1128(RJH), 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) ("As for misdiagnosis, without more, [a]llegations of negligent treatment and misdiagnosis do not state a cause of action under the Eighth Amendment." (alteration in original) (quoting *Anderson v. Lapolt*, No. 9:07-CV-1184, 2009 WL 3232418, at *13 (N.D.N.Y. Oct. 1, 2009))); *Burgess v. County of Rensselaer*, No. 1:03-CV-00652 (NPM-RFT), 2006 WL 3729750, at *8 (N.D.N.Y. Dec. 18, 2006) ("[A] claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983." (quotation omitted)). To the contrary, Nurse Haynes asked the guard to notify him if Plaintiff was still experiencing symptoms. (Dkt. 72-1 at ¶ 9). Additionally, the record before the Court shows that the reason Nurse Haynes did not continue to treat Plaintiff is

---

[8] The next morning, the record shows Plaintiff's blood sugar level was over 400. (Dkt. 72-3 at ¶ 13). The record is not clear as to whether Plaintiff was given sugar by the corrections officer as Nurse Haynes instructed, but in any event, Plaintiff may have been hyperglycemic when Nurse Haynes gave the instruction, not hypoglycemic, and thus potentially should have been given insulin instead of sugar.

because he was never subsequently informed by the guard that Plaintiff's symptoms persisted. (Dkt. 72-3 at ¶¶ 8-11).

The logbook entry relied on by Plaintiff is not dispositive. Although the officer logbook for the night in question states Nurse Haynes "did not want to see" Plaintiff (Dkt. 77-2 at 140), Defendants do not dispute that Nurse Haynes told the corrections officer it was not necessary at that time to bring Plaintiff to the infirmary. (Dkt. 72-3 at ¶ 7). Additionally, neither the logbook nor Plaintiff dispute that Nurse Haynes instructed the corrections officer to report if Plaintiff was still experiencing symptoms after consuming sugar. (Dkt. 72-1 at ¶ 9; Dkt. 77 at ¶ 1). Moreover, in his declaration, Nurse Haynes states that if the corrections officer had contacted him again, he "would have asked for [Plaintiff] to be escorted to the infirmary so further medical care could be applied." (Dkt. 72-3 at ¶ 9).

Plaintiff cites to *Weyand v. Okst*, 101 F.3d 845 (2d Cir. 1996), to support his contention that Nurse Haynes was deliberately indifferent, but the Court finds the Second Circuit's holding in that case does not apply here.[9] In *Weyand*, the Second Circuit found summary judgment was inappropriate where the plaintiff went into insulin shock, and the defendants failed to give him any medical attention at all. *Id.* at 857. In the instant matter, Nurse Haynes was not permitted on the gallery, and although he did not have Plaintiff brought to the infirmary, he nonetheless ordered treatment and monitoring for Plaintiff— he told a corrections officer to give Plaintiff sugar and to inform him if Plaintiff was still

---

[9] Plaintiff also cites to numerous out-of-circuit cases that stand for the same proposition as *Weyand*. (Dkt. 77 at ¶ 32).

experiencing symptoms after 10 minutes. (Dkt. 72-1 at ¶ 9). A reasonable trier of fact could not find on this record that Nurse Haynes consciously disregarded a substantial risk of serious harm to Plaintiff.

**III.**   **Qualified Immunity**

Defendants also contend that they are entitled to qualified immunity with respect to all of Plaintiff's claims. (*See* Dkt. 72-7 at 9-11). "The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Wood v. Moss*, 134 S. Ct. 2056, 2066-67 (2014)). Here, because the Court holds a reasonable trier of fact would find Plaintiff did not produce enough evidence to demonstrate that Defendants violated his constitutional rights, the Court does not reach the issue of whether Defendants are entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 72) is granted. Plaintiff's Complaint (Dkt. 1) is dismissed. The Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: June 17, 2019
         Rochester, New York